UNITED STATES DISTRICT COURT
                              NORTHERN DISTRICT OF ILLINOIS
                                    EASTERN DIVISION

PATRICIA VALERIO,                          )
                                           )
                 Plaintiff,                )
                                           )
         v.                                )    No. 06 C 4752
                                           )
CYGNUS BUSINESS MEDIA, INC.,               )    Judge Rebecca R. Pallmeyer
    A Delaware corporation,                )
                                           )
                 Defendant.                )

## MEMORANDUM OPINION AND ORDER

Patricia Valerio ("Valerio"), an Illinois resident, applied to work as a sales representative for two publications owned by a Wisconsin-based Cygnus Business Media, Inc. ("Cygnus"). Cygnus hired Valerio for this position, but rescinded the offer of employment prior to Valerio's start date. Valerio filed a complaint against Cygnus in the Circuit Court of Cook County, Illinois alleging breach of contract, promissory estoppel, and fraud. Cygnus removed the lawsuit to this court based on diversity of citizenship of the parties. Valerio voluntarily dismissed her breach of contract claim, and Cygnus now moves for summary judgment on the remaining claims. For the reasons stated below, Cygnus's motion is granted in part and denied in part.

## FACTUAL BACKGROUND

Cygnus, a Delaware corporation with its principal place of business in Fort Atkinson, Wisconsin, is engaged in the publication of business-to-business media products. (Compl. ¶ 2.) Among the magazines published by Cygnus were *Professional Tool and Equipment News* ("PTEN"), *Fleet Maintenance* ("FM"), *Professional Distributors* ("PD"), and *Collision Repair Product News* ("CRPN"), all of which were part of Cygnus's Transportation Group publications. (Cygnus 56.1 ¶ 8.) In August 2005, Thomas Lynch ("Lynch") became the Group Publisher of the trade magazines comprising Cygnus's Transportation Group, reporting to Paul Bowers, a Group Vice President. (Cygnus 56.1 ¶¶ 7, 9.) At the time of his appointment as Group Publisher, Lynch

promoted Eric Wixom from a position as sales representative for PTEN and PD to Associate Publisher for the newly-launched CRPN magazine. (Cygnus 56.1 ¶ 11.)

In the fall of 2005, Cygnus advertised to fill the position of sales representative for its PTEN and PD publications. (Cygnus 56.1 ¶ 15.) Patricia Valerio, who was at that time employed by Western Printing Machinery as Director of Sales for its "Cutting Technology" division, applied for the Cygnus job. (Valerio 56.1 ¶ 1, 2.) Valerio earned $65,000 per year at Western Printing Machinery, plus a bonus paid on each contract she entered into on its behalf; in 2004, she earned a total of $113,487.18 at Western. (Valerio 56.1 ¶ 3.) In late October or early November, Lynch interviewed Valerio twice in Fort Atkinson. (Cygnus 56.1 ¶ 17.) During these interviews, Valerio had the opportunity to meet with other Cygnus employees, including Bowers and Wixom. (Valerio 56.1 ¶¶ 10-11.) Lynch expressed urgency about filling the position as soon as possible and told Valerio that Cygnus wanted someone in the position around December 1, 2005. (Valerio 56.1 ¶ 14.)

After the interviews, around mid-November, Valerio called Lynch regarding the employment position at Cygnus. (Valerio 56.1 ¶ 15.) Cygnus does not deny that Valerio made this call, but the contents of the conversation are disputed. (Cygnus 56.1 Reply ¶ 15.) Valerio contends that Lynch told her that there was a possibility that one of the publications in his group might be cancelled and that she expressed concern about this, asking Lynch whether such a cancellation would prevent Cygnus from filling the sales representative position. (Valerio 56.1 ¶¶ 16-17.) According to Valerio, Lynch assured her that any cancellation would affect Lynch and his team but would not affect Valerio's hire. (Valerio 56.1 ¶¶ 18-19.) Cygnus denies that Lynch revealed the possible cancellation of a publication to Valerio; Lynch stated in his affidavit that he was unaware in late November that the CRPN might be discontinued and that, in any event, a magazine's termination, or its effect on a hiring decision, "is not something I would ever raise with a candidate we were interviewing." (Cygnus 56.1 ¶ 20, citing Lynch Aff. ¶ 16; Lynch Aff. ¶ 28.)

2

On November 28, 2005, Judy Heidebrecht, Cygnus's Vice President of Human Resources, telephoned Valerio and orally offered her the sales representative position at a base salary of $53,000 plus commissions. (Cygnus 56.1 ¶ 22.) Valerio accepted that same day and informed her supervisor at Western Printing that she was leaving the company. (Cygnus 56.1 ¶¶ 22, 25; Valerio 56.1 ¶¶ 27, 29.) Valerio apparently had second thoughts, however; on November 30, 2005, she called Lynch and withdrew her acceptance of the employment offer because she considered the salary too low. (Cygnus 56.1 ¶ 26; Valerio 56.¶ 30.) Soon afterwards (the parties do not identify the date), Lynch called Valerio back and increased the base pay offer to $60,000; Valerio again accepted and asked Lynch to put her offer in writing. (Cygnus 56.1 ¶¶ 28-29.) On December 2, 2006, Judy Heidebrecht sent Valerio, by e-mail, Cygnus's standard offer letter, which included the statement, "This is not an employment contract, as all employment at Cygnus Business Media is 'at will.'" (Cygnus 56.1 ¶ 31, quoting Dec. 2, 2005 letter, Ex. 1 to Heidebrecht Aff.) Valerio admits that the "at-will" nature of employment at Cygnus is expressly conveyed in all employment offers, that she read this language in the December 2, 2005 letter, and that Heidebrecht's letter did not offer to employ her permanently or for any definite term. (Cygnus 56.1 ¶¶ 33, 35, 38.) Because Valerio withdrew her earlier acceptance, her expected start date was pushed back from December 9 to December 12, 2005. (Cygnus 56.1 ¶ 40.) After accepting the second offer, Valerio contacted Western Printing again and resigned. (Valerio 56.1 ¶ 33.)

Cygnus asserts that at the time of the negotiations with Valerio, Cygnus personnel were not aware that CRPN would be discontinued, or the effect of that decision on Valerio's possible employment. (Cygnus 56.1 Section VI.) In support of this contention, Cygnus presents evidence that in late November or early December 2005, Richard Reiff, the then-President of Cygnus Publishing, met with Paul Meckler, Reiff's boss and CEO/President of Cygnus Business Media, to discuss CRPN's viability. (Cygnus 56.1 ¶ 56.) Cygnus states that Reiff "did not involve and would not have involved" Lynch in these discussions, nor in making the final decision regarding the future

3

of the publication, although Valerio denies this. (Cygnus 56.1 ¶ 57; Valerio 56.1 Resp. ¶57.) Reiff decided that unless the publishing group could guarantee a 20% growth in annual revenues over the next three years, Cygnus would have to end the publication of CRPN. (Cygnus 56.1 ¶ 58.)

Ultimately, on December 9, 2005, Reiff did decide to end the publication. Cygnus asserts that neither Lynch nor Heidebrecht was aware of the decision before that date. (Cygnus 56.1 ¶¶ 59, 65, 67.) In fact, Lynch was actively working on generating the 2006 budget for CRPN as late as December 2, 2005. (Cygnus 56.1 ¶ 60.) Cygnus also states that prior to December 9, Heidebrecht had every expectation that Valerio would start work on December 12. (Cygnus 56.1 ¶ 68.)

On December 9, 2005, Lynch participated in one or more meetings at which CRPN was discussed. (Cygnus 56.1 ¶ 41.) In one of those meetings, Lynch recalls, Reiff sought assurances that CRPN could generate 20% annual growth in sales over the next three years. (Cygnus 56.1 ¶ 41; Lynch Affidavit ¶ 28.) Lynch and his supervisor, Group Vice President Paul Bowers, were unable to make those assurances, and Reiff told them that CRPN was going to be cancelled at the end of December 2005. (Cygnus 56.1 ¶ 43.) Cygnus further states that Lynch and Bowers were disappointed with the decision to close CRPN and wondered how to tell the people involved with the publication, especially Wixom (who had so recently been promoted from his position as sales representative for PTEN and PD), that CRPN was being discontinued. (Cygnus 56.1 ¶ 44; Lynch Aff. ¶ 29.) Lynch and Bowers decided that the fair thing to do was to reinstate Wixom in the PTEN/PD sales position. (Cygnus 56.1 ¶ 45; Lynch Aff. ¶ 29.) Valerio objects to many of these statements as "vague, conclusory, and speculative," but she offers no evidence in rebuttal. (Valerio 56.1 Resp. ¶¶ 41-45.) She acknowledges that Wixom's transfer back to the position as sales representative for PTEN and PD meant that Lynch no longer had a position within his group for her. (Cygnus 56.1 ¶ 46.)

On the weekend prior to Valerio's planned December 12 start date, Lynch called Valerio to

4

inform her not to drive up to Fort Atkinson from her home in Chicago. (Cygnus 56.1 ¶ 48.) During this conversation, Lynch tried to explain to Valerio what had happened and to make clear that the decision to pull the magazine had been made by the Board of Directors. (Cygnus 56.1 ¶ 50.) Because Lynch and Bowers believed Valerio was a strong candidate, Lynch told her that there might be an opening in a different group and that he had already made arrangements for another Group Publisher, Tim Campbell, to interview her on Monday, December 12, 2005. (Cygnus 56.1 ¶ 53.) In fact, Heidebrecht later told Valerio that Cygnus was unable to find another position for her. (Cygnus 56.1 ¶ 54).

After Cygnus withdrew the job offer, Valerio contacted her previous manager at Western Printing Machinery to see if she could return to her job, but her manager told her that Western had already contacted all of her customers and told them that she was leaving the company. (Valerio 56.1 ¶¶ 39-41.) After Cygnus withdrew its offer, the next offer Valerio received was from Clipper Magazine earning a base salary of $40,000. (Valerio 56.1 ¶ 42.) Valerio worked at Clipper Magazine until August of 2006. She now works at Glaxo-Smith Klein Pharmaceuticals as a senior sales representative. (Valerio 56.1 ¶¶ 43-44.)

## DISCUSSION

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Timmons v. Gen. Motors Corp.,* 469 F.3d 1122, 1125 (7th Cir. 2006) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986)). In determining whether a genuine issue of material fact exists, the court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in her favor. *Gillis v. Litscher,* 468 F.3d 488, 492 (7th Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)). If the moving party demonstrates that the evidence is insufficient to establish a material element of its opponent's case,

the non-moving party must then "come forward with specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

Cygnus argues that the undisputed facts show that Valerio is unable to establish either her promissory estoppel claim or her fraud claim. Before turning to these substantive claims, the court addresses the governing law.

**I.    Choice of Law**

A district court sitting in diversity applies the "'principles of the forum state to determine which state's substantive law governs the proceeding.'" *Discover Financial Servs., LLC v. Nat'l Union Fire Ins. Co,* 527 F. Supp. 2d 806, 817 (N.D. Ill. 2007), quoting *Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006). The court's choice-of-law analysis is, thus, governed by Illinois law. Whether Plaintiff's claims sound in tort or contract, Illinois choice-of-law rules apply the "most significant relationship" test. *See Bucciarelli-Tieger v. Victory Records, Inc.* 488 F. Supp. 2d 702, 711 (N.D. Ill. 2007) ("In determining choice of law for tort actions, Illinois uses the 'most significant relationship' approach of the Restatement (Second) of Conflicts of Law."); *see also Discover Financial Servs.*, 527 F. Supp at 817 (applying "most significant relationship" test to a contract claim). To determine what state has the "most significant contacts," the court considers: (1) the place of the injury; (2) the location where the injury-causing conduct occurred; (3) the domicile of the parties; and (4) the place where the relationship between the parties is centered. *Bucciarelli-Tieger*, 488 F. Supp. 2d at 711.

Of these four factors, the first—the place of the injury—clearly favors application of Illinois law. Valerio is an Illinois resident, and she was employed here at the time she accepted Cygnus's offer and resigned her job. The third factor—the parties' domicile—provides no guidance because Valerio resides in Illinois and Cygnus has its principle place of business in Wisconsin. The second and fourth factors, however, point in the direction of Wisconsin law. The alleged injury was caused by the conduct of Cygnus's managers in Wisconsin. And the parties were negotiating for Valerio

to be employed at Cygnus's location in Wisconsin. As Wisconsin is the place where their relationship was centered, the court concludes that Wisconsin law applies.

Cygnus contends there is no genuine conflict, as Valerio's claims fail under either Wisconsin or Illinois law. With respect to Valerio's fraud claim, the court agrees that the law of either Illinois or Wisconsin law requires dismissal. For the reasons explained below, however, the court concludes that Wisconsin law recognizes a claim for promissory estoppel under the circumstances of this case.

## II. Promissory Estoppel

To establish a claim for promissory estoppel in Wisconsin, a plaintiff must demonstrate: (1) that the "promise is one which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee"; (2) that "the promise induced such action or forbearance;" and (3) that "injustice can be avoided only by enforcement of the promise." *Bicknese v. Sutula*, 260 Wis. 2d 713, 722, 660 N.W.2d 289, 295 (2003). In order to succeed on a promissory estoppel claim arising out of an employment relationship, the plaintiff ordinarily must establish that an employment contract exists. *Heinritz v. Lawrence University*, 194 Wis. 2d 606, 612, 535 N.W.2d 81, 83-84 (Wis. App. 1995). Wisconsin law carries a strong presumption that employment contracts are terminable by either party, "unless the terms of the contract or other circumstances clearly manifest the parties' intent to bind each other." *Forrer v. Sears, Roebuck & Co.*, 36 Wis. 2d 388, 393, 153 N.W.2d 587, 590 (1967).

Cygnus relies on the Wisconsin Appellate Court's decision in *Heinritz.* That case is factually very similar to this one: Lawrence University offered the plaintiff a job while he was employed by another business. 194 Wis. 2d at 610; 535 N.W.2d at 82-83. Plaintiff Heinritz accepted the University's offer and resigned his job, but the University withdrew its offer before plaintiff started work, allegedly due to problems insuring plaintiff's handicapped son. *Id.* The trial court dismissed his promissory estoppel claim, and the appellate court affirmed that determination, concluding that

a promise of at-will employment is not a basis for a claim of promissory estoppel. *Id.* at 612, 535 N.W.2d at 84.

*Heinritz* is distinguishable from the present case in one important respect, however. In this case, Valerio is alleging that she quit her job at Western States in reliance, not merely on an offer of at-will employment, but in "specific reliance on Defendant's false representations." She has produced evidence that Lynch represented to her, during a phone call in November 2005, that any cancellation of Cygnus publications would not affect her prospects for hiring. (Valerio 56.1 ¶¶ 18-19.) Cygnus disputes this contention (Cygnus 56.1 Reply ¶¶ 18-19), but a dispute of material fact is a reason to deny summary judgment, not grant it. The fact that Valerio's account of her conversation with Lynch is uncorroborated (Cygnus Reply at 3) might be a reason for a jury to reject her testimony, but on summary judgment, the court must draw all reasonable inferences in favor of Valerio, including inferences regarding her credibility. *Gillis,* 468 F.3d at 492.

The court concludes that, viewed in the light most favorable to Valerio, the evidence supports her contention that she relied to her detriment on Lynch's representation that publication cancellations would not affect her prospects for employment at Cygnus. This is a different claim than was at issue in *Heinritz*, because a promise not to terminate employment for a specific reason was not made in that case. *Id.* at 612, 535 N.W.2d at 84. Nor is there any Wisconsin authority holding that a job applicant cannot justifiably rely on a promise of at-will employment, plus an additional promise not to reject an employee for a specific reason. Accordingly, the court concludes that all of the classic elements of promissory estoppel are satisfied by Valerio's contentions, in that she claims that (1) there was a promise by Cygnus on which a person seeking a job could be expected to rely, (2) she actually relied upon that promise, resigning her employment at Western States, and (3) injustice can only be avoided by enforcement of that promise. *See Hoffman v. Red Owl Stores, Inc.*, 26 Wis. 2d 683, 698, 133 N.W.2d 267, 275 (1975) (stating the essential components of a promissory estoppel claim). Summary judgment on Valerio's promissory estoppel

claim is denied.[1]

**III.     Fraud**

Under Wisconsin law, a claim of fraudulent misrepresentation requires a plaintiff to show that the defendant made (1) a factual representation, (2) which was false, (3) made with knowledge of its falsity or recklessness, and (4) made with an intent to defraud, and (5) that the plaintiff believed the statement and relied on it to her detriment. *John Doe 1 v. Archdiocese of Milwaukee*, 303 Wis. 2d 34, 61, 734 N.W.2d 827, 839 (2007), quoting *Kaloti Enters., Inc. v. Kellogg Sales Co.*, 283 Wis. 2d 555, 569, 699 N.W. 2d 205, 211 (2005). To be actionable as fraud, a misrepresentation must be one of fact, not of opinion. Statements regarding future events are considered opinions, not statements of fact.[2] *See Friends of Kenwood v. Green*, 239 Wis. 2d 78, 86, 619 N.W.2d 271, 275 (Wis. App. 2000) ("[O]rdinarily a prediction as to events to occur in the future is to be regarded as a statement of opinion only, on which the adverse party has no right to rely."). There is an exception to this principle, however, when a promisor makes a promise regarding his future conduct, despite knowing that he has no intention to fulfill that promise. *U.S. Oil Co., Inc. v. Midwest Auto Care Servs., Inc.*, 150 Wis. 2d 80, 87, 440 N.W.2d 825, 827 (Wis. App.

---

[1] If Illinois law applied, a different result would follow. In Illinois, a claim of promissory estoppel succeeds only where all the elements of a contract exist, but consideration is absent. *Dumas v. Infinity Broadcasting Corp.,* 416 F.3d 671, 677 (7th Cir. 2005). Because an employment contract is ordinarily terminable at will, such a contract may not support a promissory estoppel claim unless the contract itself specifies a durational term. *Jago v. Miller Fluid Power Corp.*, 245 Ill. App. 3d 876, 878, 615 N.E.2d 80, 82 (2nd Dist. 1993) So long as the contract does not specify a duration, the employment relationship is considered to be "at will" even if the employment contract sets a monthly or annual salary. *Id.* Thus, under Illinois law, Valerio's promissory estoppel claim fails because the employment offer did not specify a duration of employment and in fact clearly stated it was a contract for employment at will. Nor can she raise the additional promise of Lynch to preserve her claim; she has not produced any evidence that there was an offer, an acceptance, and a meeting of the minds with respect to that alleged promise, as would be necessary under the Illinois law of promissory estoppel. *See Dumas*, 416 F.3d at 678.

[2] The rule in Illinois is even stricter. Under Illinois law, "[e]ven a false promise of future conduct with no current intent to fulfil that promise will not constitute fraud." *People ex rel. Peters v. Murphy-Knight*, 248 Ill. App. 3d 382, 387, 618 N.E.2d 459, 463 (1st Dist. 1993).

1989.)

Valerio's fraud claim relies on a theory that Tom Lynch falsely told her that at least one publication for which he was responsible at Cygnus was soon to be discontinued, but that this event would not affect her or the job offer extended to her. (Compl. ¶ 32.) This is not a statement of present fact, but rather a promise regarding the future conduct of Cygnus. Thus, it can only form the basis of a fraud claim if Valerio can prove that Lynch had no intention of fulfilling the promise *at the time it was made*. *U.S. Oil*, 150 Wis. 2d at 87, 440 N.W.2d at 827.

There is no evidence, however, that Lynch did not believe this statement when he made it. Even if Lynch had been aware that there were discussions within Cygnus about closing the publications, Valerio offers no evidence that suggests he deliberately attempted to mislead her. Indeed, if Lynch did not genuinely want to hire Valerio, there is no reason for him to have agreed to increase her base salary after she initially withdrew her acceptance of the earlier offer on November 28, nor to have attempted to find her another position at Cygnus after the position for which she had been hired fell through. Neither Lynch personally, nor Cygnus, benefitted in any way from the fact that the change in publication plans eliminated the need to hire Valerio. A plaintiff need not prove that the defendant benefitted by an alleged fraud, but the fact that the circumstances created no advantage for Cygnus undermines Valerio's assertion that Cygnus committed an intentional tort.

## **CONCLUSION**

For the reasons stated above, Cygnus's motion for summary judgment (18) is granted in part and denied in part. Valerio's fraud claim is dismissed, but her promissory estoppel claim

survives. A status conference is set for April 21, 2008 at 9:00 a.m. As Plaintiff's damages appear to be modest, the parties are urged to discuss the possibility of settlement.

ENTER:

Dated: March 31, 2008

REBECCA R. PALLMEYER
United States District Judge